UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KELLY SUTTNER,

        Plaintiff,

     v.                                   Case No. 20-C-583

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

---

      Plaintiff Kelly Suttner filed this action for review of the decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff asserts that the decision of the Administrative Law Judge (ALJ) is flawed and requires remand because the ALJ failed to properly evaluate her idiopathic transverse myelitis condition and failed to ensure the reliability of the methodology the vocational expert (VE) used in determining the number of available jobs in the national economy. For the reasons that follow, the Commissioner's decision is affirmed.

## BACKGROUND

      On July 18, 2014, Plaintiff completed an application for a period of disability and disability insurance benefits, alleging disability beginning October 2, 2011. R. 163. Plaintiff's date last insured was September 30, 2013. Plaintiff listed impairments in both legs, soft tissue injuries of the ankle requiring multiple procedures, panic attacks, anxiety, and multiple sclerosis of the neck and spine as the conditions that limited her ability to work. R. 199. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an ALJ. ALJ Jeffry

Gauthier conducted a hearing on January 30, 2017. Plaintiff, who was represented by counsel, and a VE testified. R. 39–76.

At the time of the hearing, Plaintiff was 50 years old and lived in a two-story house with her husband in Kiel, Wisconsin. R. 47, 68. She was five feet and weighed 195 pounds. R. 48. She testified that she stopped driving after her son's death in a car accident. R. 49–50. Plaintiff completed high school and completed a one-year college-level computer skills course. R. 50–51. She previously worked as a waitress. R. 51. During the last two-and-a-half years she worked, she wore a walking boot on her left foot after a workplace injury in 2009. She explained that she fell in the kitchen at work and hurt her left ankle. *Id.* Plaintiff filed a worker's compensation claim and settled the claim for $20,000. R. 58. She described her ankle pain as sharp, stabbing, and constant. R. 62. Plaintiff testified that she had three cortisone injections in her joint that provided relief for two weeks. R. 63. She stated that the lesion in her spine contributed to her being disabled and unable to work. Plaintiff testified that, even though the lesion was discovered in June 2014, she believed the condition existed prior to September 30, 2013, because she had difficulty with balance and foot drop. R. 64. She stated that she did not complain to any doctor prior to September 2013 about foot drop or balance issues. R. 65–66. Plaintiff testified that she did not recall having any symptoms that she would attribute to transverse myelitis or the lesion on the cervical spine prior to September 30, 2013. R. 66. Plaintiff stated that her ankle injury made it difficult to do housework. *Id.* She testified that she slept on the first floor of the house, even though her bedroom was on the second floor. R. 68.

In a written decision dated May 15, 2017, the ALJ found Plaintiff was not disabled. R. 22–32. The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Plaintiff subsequently filed a complaint in

the United States District Court for the Eastern District of Wisconsin seeking judicial review of the ALJ's decision. The matter was reversed and remanded for further proceedings based upon a stipulation of the parties. R. 771; *see also Suttner v. Berryhill*, No. 18-CV-964 (E.D. Wis.).

ALJ Brent Bedwell held a second administrative hearing on remand on January 23, 2020. Both Plaintiff, who was represented by counsel, and a VE testified. R. 683–721. At the time of the second hearing, Plaintiff was 53 years old. R. 961. Plaintiff testified that she stopped driving after she was discovered to have foot drop and that she was unable to work because of her foot drop. R. 692. She reported that the muscles in her leg were not working and she was tripping. R. 695. Plaintiff testified that she had pain in her right leg and laid down three hours a day. R. 703–04. She reported that she used a cane, could stand for ten minutes at one time, and could move around for twenty minutes. R. 705. In 2014, after the date last insured, she was diagnosed with idiopathic transverse myelitis. R. 689.

In a twelve-page decision dated February 10, 2020, the ALJ concluded that Plaintiff was not disabled from October 2, 2011, the alleged onset of disability, through September 30, 2013, her date last insured. R. 662–73. Following the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA), the ALJ found that Plaintiff last met the insured status requirements on September 30, 2013, and that Plaintiff had not engaged in substantial gainful activity from October 2, 2011, through September 30, 2013. R. 664. Next, the ALJ determined that, through the date last insured, Plaintiff had the following severe impairments: left ankle disorder and clinical obesity. *Id.* The ALJ found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 667.

3

After considering the record, the ALJ determined that, through the date last insured, Plaintiff had the residual functional capacity (RFC) to perform sedentary work, "except with no more than occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolding or operating of foot controls; and she must avoid exposure to hazards, heights, and moving machinery." R. 667. The ALJ found that, through the date last insured, Plaintiff was unable to perform any past relevant work as a waitress or short order cook but concluded that, based on her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including office clerk, receptionist, or order clerk. R. 671–72. Based on these findings, the ALJ concluded Plaintiff was not under a disability at any time from October 2, 2011, through September 30, 2013. R. 672.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

4

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court has reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S.

5

at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**A. Idiopathic Transverse Myelitis**

Plaintiff asserts that the ALJ erred by failing to properly evaluate the retrospective diagnosis of idiopathic transverse myelitis (ITM) and the medical opinions. She argues that, although her ITM diagnosis was made after her date last insured, the medical evidence establishes

6

that the condition existed and was disabling during the relevant time period. Plaintiff asserts that the ALJ's failure to consider her ITM condition and accommodate it in the RFC resulted in an RFC that is not supported by substantial evidence. An RFC is an assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect her ability to work. SSR 96-8p, 1996 WL 374184, at *2. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting SSR 96-8p). In forming the RFC, an ALJ must review all of the relevant evidence in the record and "consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

A fair reading of the ALJ's decision reveals that he fully considered the evidence in assessing Plaintiff's RFC. It was Plaintiff's burden to establish that she was disabled on or before her date last insured, September 30, 2013. *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012) ("[W]hatever condition the claimant may be in at his hearing, the claimant must establish that he was disabled before the expiration of his insured status . . . to be eligible for disability insurance benefits."). The ALJ noted that Plaintiff was "diagnosed with a neurological disorder of transverse myelitis with resulting foot drop and spasticity of her lower extremities after the date last insured." R. 666. He found the condition was a nonmedically determinable impairment for the period at issue because there was no objective evidence showing this condition existed prior to her date last insured. *Id.* The ALJ noted that, during a May 2014 examination, Plaintiff reported a right foot drop for two and a half years and that, during an October 2016 examination, Plaintiff stated she had right leg spasticity and foot drop. The ALJ observed, however, that the earliest objective observation of Plaintiff having a foot drop occurred during February and March 2014

7

examinations. He explained that the only gait disturbance noted prior to that was Plaintiff having an antalgic gait on the left side without mention of a foot drop or spasticity on the right, and an August 2012 EMG proved negative. The ALJ noted that diagnostic imaging did not reveal a spinal cord lesion until May 2014, and the treating provider indicated the finding did not address her reported left ankle issue. The ALJ indicated that, "[m]arkedly, when asked directly at the initial hearing whether the claimant had experienced, complained of, or reported any symptoms related to transverse myelitis prior to her date last insured, the claimant responded no to all three questions." *Id.* He noted that at the second hearing, however, Plaintiff's testimony changed "to fit the narrative that her transverse myelitis occurred prior to her date last insured." *Id.*

The ALJ found that Plaintiff's statements at the second hearing were inconsistent with the objective evidence. He noted that Dr. Dermot More-O'Ferrall, who personally observed and examined Plaintiff, opined in January 2013 that Plaintiff was capable of performing sedentary work. R. 669. The ALJ explained that his opinions were consistent with Plaintiff having no identified upper extremity, respiratory, or cardiology deficits during examinations, Plaintiff having relatively good objective left ankle findings, and findings of treating providers indicating that diagnostic imaging did not substantiate Plaintiff's reported pain levels. The ALJ noted that Drs. Michael Iossi and John Livermore asserted in March and April 2013 that Plaintiff had no work limitations. R. 670. The ALJ pointed to Dr. Webber's note that Plaintiff could return to work despite her restrictions, although Dr. Webber did not indicate what his specific restrictions are.

The ALJ also considered the opinions of the state agency reviewing physicians, who found that Plaintiff remained capable of performing sedentary work. He observed that their opinions were consistent with the overall record, which showed Plaintiff having intact activities of daily living, having relatively good objective physical examination findings, not being a surgical

candidate, and having diagnostic imaging results that did not correspond with her reports of pain. *Id.*

The ALJ gave no weight to the opinions of treating provider Dr. Stephen Kunkel, who stated in July 2015 and January 2016 that Plaintiff was unable to sustain even sedentary work on a regular and continuing basis. Plaintiff contends that the ALJ erred in assessing Dr. Stephen Kunkel's retrospective conclusions. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 512; 20 C.F.R. § 416.927(c)(2); SSR 96-2p. If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Dr. Kunkle opined in July 2015 and January 2016 that, since October 2011, Plaintiff had disabling symptoms and limitations due to transverse myelitis. R. 484–90, 493. The ALJ gave Dr. Kunkle's opinions no weight. R. 670. The ALJ noted that, while Dr. Kunkel's January 2016 letter stated that he first started treating Plaintiff for transverse myelitis in spring 2013, his treatment notes reflect that he actually began treating her in December 2014. The ALJ explained

that these notes appear more consistent with the record because diagnostic imaging did not show Plaintiff having the condition until May 2014.  *Id.*  The ALJ thoroughly reviewed the record and explained how Dr. Kunkel's opinion was inconsistent with the medical record, including his own treatment notes, and the other evidence in the record, such as Plaintiff's reported symptoms.  In short, the ALJ provided an "accurate and logical bridge" between the evidence and his conclusions.  *Roddy*, 705 F.3d at 636.

Plaintiff asserts that the ALJ played doctor in evaluating the diagnostic and clinical findings.  The Seventh Circuit has repeatedly cautioned that an ALJ "cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so" and "cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."  *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citation omitted).  The ALJ did not "play doctor" as Plaintiff suggests.  Instead, the ALJ reviewed the treatment notes, findings of Plaintiff's medical providers, and other evidence in the medical record; evaluated the conflicting medical evidence; and determined Plaintiff's RFC.

Plaintiff also argues that the ALJ did not properly apply SSR 18-1p, which Plaintiff maintains requires the ALJ to determine "whether the condition would have been disabling regardless of when the condition was diagnosed or an opinion on limitations reached."  Pl.'s Br. at 28, Dkt. No. 15.  SSR 18-1p, entitled "Titles II and XVI: Determining the Established Onset Date (EOD) in Disability Claims," provides that an ALJ will not consider "whether the claimant first met the statutory definition of disability on a date that is beyond the period under consideration."  2018 WL 4945639, at *6; *see also id.* at *5 n.17 ("[I]f we find that the claimant did not meet the statutory definition of disability before his or her insured status expired, we will not determine whether the claimant is currently disabled or was disabled within the 12-month

10

period before the month that he or she applied for benefits."). Although Plaintiff asserts that the ALJ was required to obtain a medical expert (ME) to assist the ALJ in determining "the relationship of evidence and the onset date," Pl's Br. at 29, SSR 18-1p instructs that the decision to call on the services of an ME is at the ALJ's discretion and "[n]either the claimant nor his or her representative can require an ALJ to call on the services of an ME to assist in inferring the date that the claimant first met the statutory definition of disability." 2018 WL 4945639, at *6. The ALJ adequately explained how he arrived at his conclusions, and substantial evidence supports his RFC finding. Remand is therefore not warranted on this basis.

**B. VE Testimony**

Plaintiff also argues that the ALJ failed to elicit a reasoned and principled explanation of the VE's job incidence numbers before relying on the VE's testimony to support the step five denial. At step five of the sequential evaluation process, the Commissioner has the burden of demonstrating the existence of significant number of jobs in the national economy that a plaintiff can perform. *See* 20 C.F.R. §§ 404.1560(c)(1); 416.960(c)(1). The Seventh Circuit has held that, in assessing a VE's testimony concerning the number of jobs a claimant can perform, "the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citation omitted). Plaintiff asserts that the ALJ failed to assess the reliability of the methodology the VE used in this case.

At the second administrative hearing, the ALJ asked the VE whether there were any jobs in the national economy that a person with Plaintiff's age, education, work experience, and RFC could perform. R. 715–16. The VE responded that there were and listed three categories of jobs Plaintiff could perform: office clerks, of which there were 280,000 positions; receptionists, of

11

which there were 85,000 positions; and order clerks, of which there were 20,000 positions in the nation. R. 716. The VE testified that these categories of occupations had an SVP level of 2. The VE also stated that his testimony was consistent with the Dictionary of Occupational Titles as well as his professional knowledge and experience. R. 717. When Plaintiff's attorney asked the VE what the source of the job numbers was, the VE responded that his sources are the U.S. Department of Labor Employment Statistics and the United Statistics Publishing Company in Overland Park, Kansas. R. 718. He explained that "they're representative codes that I give in many cases because they're a combination of the SOC codes or the census codes with various DOT numbers." R. 719. Plaintiff's attorney did not further question the VE or object to his methodology.

Generally, a plaintiff forfeits an objection to a VE's testimony if it is not raised at the hearing. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016). "Before accepting a VE's job-number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation." *Chavez*, 895 F.3d at 970. At the administrative hearing, Plaintiff merely asked the VE what the sources of his job estimates were; she did not challenge the VE's methodology or otherwise elicit statements that called the reliability of the VE's conclusions into question. Because Plaintiff did not challenge the VE's testimony or methodology at the hearing, she cannot do so here.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 15th day of September, 2021.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge